Bellacosa, J.
(dissenting in part). This appeal relates to a premises licensing agreement between the State of New York and the City of New York for the State’s occupation and use of City real property. The question raised is whether the agreement required additional approval by the State Comptroller under State Finance Law § 112 (2) after the expiration of its stated term. We believe that it does, essentially because of the inescapable impact of Real Property Law § 232 and because *987 the purposes behind State Finance Law § 112 (2) would otherwise be frustrated. Thus, we respectfully dissent in part, and vote to affirm the order of the Appellate Division.
Claimant City of New York agreed to rent office space in a building it owned at 2 Lafayette Street in Manhattan to defendant State of New York, for use as a rent administration office by the State Division of Housing and Community Renewal (DHCR). The agreement was to run from April 1, 1984 through January 31,1986, with either party having the option to cancel upon 45 days’ prior written notice to the other party. As required by State Finance Law § 112 (2), the State Comptroller approved the agreement in September 1985. No one questions the Comptroller’s authority or the validity of this approval as far as it goes.
In addition to fixing the end of the term at January 31, 1986, article IV of the agreement contemplated that DHCR might remain in possession of the premises after that date, by providing for an increase in rental payments if DHCR did not vacate. In that event, the payments were to increase from $15 per square foot to $23.50 per square foot, for the 14,400 square feet.
DHCR did not vacate the premises on January 31, 1986, but instead remained and paid the higher rent, which amounted to monthly installments of $28,200, through April 1987, after which it began making sporadic payments. In approximately July 1987, DHCR returned about half of the premises to the City, which then prorated the monthly bill to account for the reduced space. Again in June 1989, DHCR returned an additional portion of the premises to the City, which continued to charge for the space on a prorated basis. Ultimately, DHCR was occupying about one fifth of the originally secured premises.
The State eventually vacated the remaining portion of the premises in August 1989, leaving a substantial portion of its alleged obligations unpaid. The City, as claimant, sought total arrears of $240,040.68. The Court of Claims granted summary judgment to the State and dismissed the City’s claim. It held that after January 31, 1986, the agreement created an indefinite term of occupancy, which terminated by operation of Real Property Law § 232 on October 1, 1986. The court held the State Comptroller’s initial approval of the agreement under State Finance Law § 112 did not extend beyond that date and that further approval by the Comptroller under these circumstances would be required for the City to recover additional *988 amounts for the extended periods. Recoupment by the State of any moneys paid is not in issue or implicated by the resolution of this dispute.
The Appellate Division unanimously affirmed, basically agreeing with the Court of Claims that the contract became one of indefinite duration and that, therefore, it ended by operation of law on October 1, 1986. The Court added that because of Real Property Law § 232, DHCR’s obligation to pay additional amounts after October 1, 1986 required further approval by the State Comptroller under State Finance Law § 112 (2). We agree that the Comptroller’s September 1985 approval of the agreement did not indefinitely extend the State’s liability under the agreement, solely at the discretion and in the control of DHCR. By operation of law, Real Property Law § 232 marks the boundary of such an indefinite agreement. Thus, we would affirm the lower courts’ rulings.
The Constitution and the Legislature have designated the State Comptroller as the unique protector of the State’s pocketbook (see generally, NY Const, art V, § 1; State Finance Law § 8). This role includes the power to approve or disapprove State contracts valued above a statutorily set amount (State Finance Law § 112 [2]). State Finance Law § 112 (2), as it existed at the time of the agreement at issue, provided as follows:
"Before any contract made for or by any state department * * * shall be executed or become effective, whenever such contract exceeds five thousand dollars in amount [$10,000 as of September 1, 1992 (L 1992, ch 319)], it shall first be approved by the comptroller and filed in his office.”
The law is well settled that a failure to comply with the mandate of State Finance Law § 112 (2) affords the State a complete defense to what would otherwise be binding contractual obligations (see, Parsa v State of New York, 64 NY2d 143, 147). The nuance of this case is whether the State Comptroller’s September 1985 approval of the basic agreement itself allowed the State to incur liability for an indefinite holdover period of DHCR’s occupancy, through August 1989, or whether some further approval in the circumstances of this agreement — concededly not obtained in this case — was necessary.
To determine whether the agreement at issue warranted such approval, the examination necessarily begins with the particular governing statute and its purposes (State Finance Law § 112 [2]; see, McKinney’s Cons Laws of NY, Book 1, *989 Statutes § 96, at 202 ["A basic consideration in the interpretation of a statute is the general spirit and purpose underlying its enactment.”]). The statute’s twin purposes are both related to the protection of the public fisc: (1) to prevent State officers and agents from creating liability for which there has been no appropriation of public funds, and (2) to rein in public officials from making improvident contracts that might result in serious financial consequences to the State (1934 Opns Atty Gen 162, 163; see also, Deverho Constr. Co. v State of New York, 94 Misc 2d 1053, 1058).
The statute’s first purpose, to ensure that all public expenditures are backed by appropriated funds, is most noticeably implicated here and is given virtually no moment by the majority’s analysis. That objective is threatened by a contract that purports to extend into an indefinite period with no limiting features, because there could never be certainty that sufficient revenues would be available open endedly and in futuro (see, 1915 Opns Atty Gen 28, 29). Although the agreement expresses an end date of January 31, 1986, article IV of the agreement at the same time purports to allow DHCR to remain in possession with no termination date whatsoever. While the Comptroller was on notice that an indefinite extension of the State’s occupancy was within his initial approval, he was also aware and entitled to rely on a pari materia statutory provision, Real Property Law § 232, that by operation of law placed legislatively fixed definiteness on the agreement and his fiscal superintendence upon it. This is a fine point of our difference with the majority’s summary dispatch of Real Property Law § 232 as merely "a statute of limited purpose and application” (majority mem, at 985).
I believe, instead, that Real Property Law § 232 is unassailably apt and that it circumscribed State liability for this kind of agreement on October 1, 1986, by providing that:
"An agreement for the occupation of real estate in the city of New York, which shall not particularly specify the duration of the occupation, shall be deemed to continue until the first day of October next after the possession commences under the agreement” (Real Property Law § 232).
The statute applies only to agreements of indefinite duration (see, Chester v Niarchos, 12 Misc 2d 325, 328) and is inapplicable if the duration of the term is specified (see, Olson v Schevlovitz, 91 App Div 405, 406-407). Thus, our analysis does not implicate or undermine the validity of the Comptroller’s ap *990 provals of contracts containing durational optional renewal clauses. Since, in this case, any period beyond January 1, 1986 had no termination date, the agreement here qualifies as a type of agreement intended to be covered by Real Property Law § 232, because it did "not particularly specify the duration of the occupation.” Because the indefinite period commenced on February 1, 1986, Real Property Law § 232 was triggered and fixes the end point as October 1, 1986. Thus, the Comptroller’s initial approval was valid only up to that date, and any liabilities allegedly incurred thereafter are blocked by failure to obtain the Comptroller’s additional, specific approval under State Finance Law § 112 (2).
We emphasize that this analysis does not extend to all ordinary durational option arrangements in contracts approved by the Comptroller. Nor is the analysis altered, as the City urges, by article III of the agreement, which provides that either party may terminate the agreement upon 45 days’ notice. That provision does not neutralize the indefinite nature of the holdover period of this agreement. In fact, the mutual termination clause is further evidence that after January 31, 1986, the contract was transformed into one of indefinite duration, thus fortifying the application of Real Property Law § 232 (see generally, Garner v Gerrish, 63 NY2d 575).
Moreover, it is not the Comptroller who is authorized under article III to terminate the agreement upon 45 days’ notice, which might, in that case, preserve his unique and nondelegable duty to protect the public fisc. Instead, that termination option is reserved to the two State agencies that contracted with the City in this case, DHCR and the State Office of General Services, both deemed "Licensee” in the agreement. Those agencies, however, are precisely the kinds of entities over which the Comptroller has singular oversight. To vest them with the virtually unfettered discretion and authority as to when to terminate or extend an indefinite agreement like the present one and incur unsupervised liabilities paid for out of unappropriated State revenues would undermine the express protections within State Finance Law § 112 (2) as applied to this agreement (Parsa v State of New York, 64 NY2d 143, 147, supra).
This Court has pointedly emphasized in related circumstances that "any other rule would completely frustrate statutes designed to protect the public from governmental misconduct or improvidence” (id.). Fiscal consequences such as are implicated and claimed here are unauthorized and *991 unprotected, "because contracting parties are better able to protect themselves from State Finance Law § 112 than the people would be to protect themselves without it” (Rosefsky v State of New York, 205 AD2d 120, 125). This is especially so when the disputants are both public entities, quarreling over State funds.
An additional feature of this case, with respect to which we are in full accord with the majority, is that the parties’ bargain changed materially between the time of the Comptroller’s approval in September 1985 and the time when DHCR gave back half the premises to the City in July 1987 at the latest. What was, in effect, created in this respect was a new and different agreement to pay amounts still substantially in excess of the former statutory threshold (State Finance Law § 112 [2]). The Comptroller’s original approval of an agreement so materially changed, thus, cannot be deemed to continue indefinitely. Significantly, article XI of the agreement specifically provided that the agreement could not "be changed, modified, or terminated orally, [except] by an instrument in writing executed by Licensor and Licensee.” The City and DHCR purportedly orally modified this contract by DHCR surrendering large parts of the premises to the City, first in July 1987 and later in June 1989, with no Comptroller notification or approval (see, e.g., Flaherty Corp. v State of New York, 102 Misc 2d 438, 441; see also, Sorrentino v State of New York, 13 AD2d 5, 9 [supplemental agreement modifying an existing contract, not approved by Comptroller, was not effective], affd 11 NY2d 695).
In short, in our view, for comparable statutory construction and policy reasons, the order should be affirmed in toto. After October 1,1986, when the indefinite agreement ended by operation of Real Property Law § 232 (on this the Court is divided), as well as after July 1987, the later date at which the bargain was materially altered (on this the Court is unanimous), the State acquired a statutorily conferred affirmative defense to additional liability under this indefinite, changed agreement. Thus, additional approval from the Comptroller should be required under State Finance Law § 112 (2) and the combined effect of Real Property Law § 232. The Appellate Division was therefore correct in affirming the Court of Claims’ dismissal of the City’s claim, and the order appealed from should be affirmed.
*992 Chief Judge Kaye and Judges Simons, Titone, Smith and Levine concur in memorandum; Judge Bellacosa dissents in part and votes to affirm in an opinion in which Judge Ciparick concurs.
Order modified, etc.